Good morning. My name is Craig Spiegel. I represent the plaintiffs in all four of these cases. These cases involve the sale of undeveloped lots in subdivisions in the Boise area. We initially sued all four defendants in the same action. The district court ruled that we had not sufficiently alleged concerted action by the defendants in violation of the antitrust laws and therefore dismissed the concerted action claims and ordered us to file separate actions. We are not appealing from the order dismissing our claims of concerted action. So now we have four individual cases, but they're alleging essentially the same thing, and that is this, that the defendant's realty agencies offered undeveloped lots for sale. Plaintiffs went to buy those undeveloped lots. They were, however, not allowed to buy the undeveloped lot. They had to sign an agreement with a builder that incorporated not only the price they had been told that the lot would cost, but also the expected price of building the house. And I say expected because nothing was done in terms of building a house at the time these agreements were signed. There had been no breaking of ground, no building of houses. And as part of this agreement, the defendant realtors were paid a commission based on the price of the lot and the house together, even though that ended their involvement and they were getting this as if there were a house already built on the property. Now, I want to make it clear that we did not bring this case on behalf of people who were buying, for example, spec houses, houses that had already been built. The classes we got certified did not include spec houses. The classes were limited to situations where at the time the agreements were signed, there was no house of any kind on the lot, and yet the defendants got a commission based on the price of the lot, plus what the house was expected to cost to build.  Sotomayor So maybe your clients were overcharged. Carvin That is right. Our claim is they were. Sotomayor Maybe they were. But where – what is the – what's the market that was foreclosed? Carvin That would be – Sotomayor The competition was foreclosed. Carvin The market for agencies who would provide services related to building houses on undeveloped lots. Sotomayor Was there any evidence of that? Carvin The evidence is the defendants moved for summary judgment on the ground that there was no foreclosure in that. Sotomayor I don't see any evidence that shows any foreclosure of competition in any identifiable market. Carvin Well, the market would be if I went out and put aside this case and I bought a lot. Sotomayor Yes. Carvin And now I want to build a house on that lot. Sotomayor Yes. Carvin Agencies, realtors, can be involved in that process of helping to – I want to build a house in a place where I can provide services to the buyers from retaining a broker. And I think, as I recall, some did. Carvin That's right, on their side. Sotomayor Their interests. Carvin But the price included a commission on both sides. They were forced to pay a commission when the – Sotomayor So what? I mean, so they were overcharged. I mean, maybe. Carvin Well, they could have had an agent to help buy the lot. Sotomayor Yes, they could have. Carvin And then paid a commission based on the price of the lot. But that's not what happened. They had to – Sotomayor The realtors were listing agents, in effect. Carvin Yes. Sotomayor Who performed listing services for developers, home builders. And they charged a commission, which the home builders, I take it, in effect, passed through. But what your clients were charged was a price to have a house built from the home builders. And it may have included commissions. It may have included taxes. It may have included whatever the market would dare. Carvin That's right. And it's our contention. Sotomayor So but where is there any foreclosure of competition in a market for non-for listing services on behalf of a buyer? It just doesn't – it's not – it doesn't make economic sense to me. Carvin The competition is lost in the sense of searching for realtors and having a competition for pricing and services in connection with the building of the house. There were no services here. There was simply a jacked-up price of the commission and an inflated price, which is what tying arrangements are about. You're paying more than you would like for getting things that you don't want. Kennedy They didn't have to go through with a deal. They didn't have to buy into this. Carvin Then they could not buy an undeveloped lot in a subdivision in Boise. There were no alternatives. This is how it works. This is how all of the agencies do it there. If there had been other developments, a lot of developments with subdivisions, with undeveloped lots that they could have bought, and then they could have built a house and they didn't have this restriction, we wouldn't have brought the case. But it can't be done in the Boise area. There is no open area for subdivisions to buy a lot, pay a commission solely based on that lot, and then arrange to have a house built on that lot, and deal with the builder in terms of what brokers are going to be involved, how much they're going to get paid, and have the marketplace for the realty agencies do what it does, and lower the price, raise the price, not use any at all, and therefore pay a lower price in total. But they couldn't do that. There was no alternative. The whole area is foreclosed from that kind of a purchase of an undeveloped lot because these real estate agencies are controlling the market in the Boise area in terms of buying an undeveloped lot and then dealing with a broker, dealing with a builder to build a house on that lot that you have purchased. So you're forced to buy the whole package. So? It would be the same as buying a truck and a trailer. So you got a truck and a trailer. That's good. But you may not want the trailer. Well, you want the house. You want the house, but we don't want the services of a real estate agency where there hasn't been any kind of house built and they're not involved in the process of building the house. They're charging a price for as if a house had been built and yet the process of building a house is not an easy one. You'd want, in many ways, a better agent to help you in that process. All the problems of the house. I don't understand why you need an agent at all to build a house. You may not. Well, then what market is being foreclosed if you don't need an agent to build a house? You don't need one, but you may want one. Isn't it, as Judge Reimer says, this is just simply price gouging? In other words, you're getting something you don't want, right? I mean, nobody else is being foreclosed from selling you that because you wouldn't buy it from anybody, would you? In fact, isn't that what your clients testified to at that position? No, I don't want that. But name plaintiffs. That's correct. Well, and there's no, as Judge Winville says, there's no plausible basis to believe that anybody would want to buy this if they had a choice, right? That's what Judge Winville said, but I respect that. I know that. Well, give us a plausible theory why somebody would want to buy this. Did you say, you know, who needs a real estate agent to build a house? They can help in all kinds of ways. Many people want agents to help them through the difficult process. Of what? Of building a house? Of dealing with the builder, Your Honor. Of arranging for having the house built. Of dealing with problems. Of saying, I'm not a house builder. I want agents involved on both sides. Is there evidence in the record that there is a market in Boise for the services of a real estate agent in building a house? They didn't move for summary judgment on that. So, no, we did not submit on that issue. They moved for summary judgment that, you know, no market was being foreclosed. So you have to show that there was a market for that. But they moved on the ground that nobody would want to use services like that. And that's not in our estimation. And you haven't shown any plausible basis to believe that anybody would want it. What's in the record that shows that? You're saying yourself, you know, you wouldn't want it, I wouldn't want it, your clients wouldn't want it. Who would want it? Our named plaintiffs didn't want it. But in a tying case, the burden of showing foreclosure in the tied service or tied product market is very low. There doesn't have to be much foreclosure at all. You haven't shown it. The problem is you haven't shown the tied service. You've just shown, you know, price gouging and the service being offered. That's really all you've shown, as far as I can tell from the record. We're entitled to reasonable inferences. And people use Exactly right. Reasonable inferences, not implausible ones. Evidence in the sense that it is a reasonable inference. People do use agents to build houses. It's just Nothing in the record shows that. I don't. The defendants didn't argue that people never use them, never use agents to build houses. Their argument was that because our plaintiffs wouldn't want to use such services, therefore the burden shifted to us and the inference is that no one would ever want to Exactly. The burden shifted to you and, you know, you've made no showing. We don't believe the burden did shift to us because the question is what would the class members, what would people have wanted? We never got the list of class members. The question shouldn't be one of inferences. Well, anybody, you know, anybody. There's no record that anybody wants the service. But the question is in this case, would people who were foreclosed were class members? Those people, not someone else. If we had someone else and they'd rightly come back and say we don't care about other people. We care about people that you claim were affected by our alleged wrongdoing. We don't know who those people are. We got classes certified. But the notice, the notice was approved. The notice never went out. So we couldn't, in our estimation, even talk to the small number of people that they identified because as plaintiff's lawyers, until the opt-out period is up, we can't go out just contacting people and saying here's their claim, here's what we think. Your clients are typical of the class that they're reporting to represent. They don't want these services. So what reasonable, plausible, sensible reason is there to believe that anybody else similarly situated would want the services either? I mean, otherwise you're not even representative of the class. Well, Your Honor, but that would say that in any tying case where the burden is low on the zero foreclosure issue, where you don't have to show that everyone wanted to buy the type, right, you just have to show a not insubstantial foreclosure that your only people, people can be in the class only if they are in that small percentage who would have wanted to buy it. I'm not faulting the class certification thing. I'm just saying that your clients are presumptively typical. So I don't get what difference it would have made if you'd been able or you could have, if you wanted to, go knock on doors in these subdivisions and ask people if any of them would have wanted to have services that you were paying for. As the Boeing case and other cases we cited say, typicality is not, does not mean you're a debtor. I understand, but there's no plausible – if your clients who are supposedly typical don't want those services, why should it be reasonable to suppose that anybody else would either? That's a handful of what we think are thousands of people. Here's something, this thing's like Alice in Wonderland. I spent a lot of time trying to figure out what was going on here. I've had a lot of experience in subdivisions and all that kind of information, and I still don't know what you're talking about half the time. Give a diagram of this. Yes, sir. May I have one moment with the time running? Why don't you just listen to what they say, maybe save your time for rebuttal. Thank you, Your Honor. I will do that. Good morning, Your Honors, Counsel. My name is Gene Ritty. I represent Holland Realty. I will address the zero foreclosure and the issues raised by the appellants on the Rule 56-F matter. Mr. Hartley, representing Aspen Realty, will talk about why these plaintiffs really didn't buy anything in these circumstances. But even if they did, they would be barred under the Illinois brick indirect purchaser doctrine. Mr. Boardman, on behalf of John L. Scott, Mr. Scott, on behalf of Cell Equity, are here to answer any questions as to their clients the court may have. Here's what we did show, and here's why the burden did shift to the appellants to come forth with some evidence about the detrimental impact on competition for the tied product, because that's all zero foreclosure focuses on is who selling the tied product has been hindered in their sales of it due to what the defendants did. And here's what we showed. We showed each of their depositions where they admit it. We don't we didn't want to pay anything for some of them said we didn't want to pay any commission. Some of them said we would only pay a commission for the lot. They all said we don't want anything to do with services on the sale of this house theory. Mr. Hartley asked the Baethuses, Mrs. Baethus in her deposition, do you know of anyone else in your subdivision who wants to pay for the tied product? She admitted no. He asked, do you know anyone else in any of the other subdivisions for which your complaint is concerned? Do any of them want to buy the tied product? She admitted no. In that deposition in the process of questioning the plaintiffs, how did you define the tied product? Well, Your Honor, that was an interesting question because, as you know, we moved to dismiss on the grounds that they didn't even allege properly allege the relevant market. That motion to dismiss was denied essentially without comment by the district court early on in the case. But we struggled with it, and during the various hearings and motions to clarify the class, they kept changing their definition. But as it shows up in the class definition, it came down to the tying product being sales of lots. We don't even think sales is a product to begin with, and the tied product ended up being services on the houses to be constructed on the lots. So for purposes of our zero foreclosure argument, we accepted their theory of the case. Their theory of the case really, the reason why it fails is if we go back to the complaints, many of which were filed in this case. They first started in March of 2004 with this theory. Another complaint in May of 2005, August of 2005, February of 2006. But the allegations were always the same. The key paragraphs in the complaints, at least in the Holland case, paragraphs 37 and 44 of the February 28, 2006 complaint. Those paragraphs say the competition that was affected were those realtors who were selling the tying product, those who were willing to just charge a commission on the lot sale, period. The key paragraphs, the operative language in their complaints, doesn't even address who was selling the tied product and the detrimental impact on competition among those sellers of the tied product. So when they struggle to come up with evidence from anyone with either among themselves or within the class as to I'll pay something for the tying product or for the tied product, it's no surprise that they can't find any because it was never their theory of the case set forth in their complaint. They always focused on competition for the tying product. Zero foreclosure and the requirement to show a not insubstantial effect on competition for the tied product focuses on that tied product. They consistently ignored it. It wasn't their theory of the case from the very beginning. Can I ask you a question? Why was this deal set up this way? Well, there are sound economic reasons. First of all, I do have to correct something that I believe I heard Mr. Spiegel say this morning, and that is you can't buy anything in Boise without going through the transaction of which they complain here. Well, one, I'll say that's not true, but more importantly, I'll say there's nothing in the record before this court that supports that statement. There's nothing in the appellate record, much less the district court record, that supports that factual statement that he made, totally unsupported. The economic reasons for doing things the way that it was done here, the developers have this chunk of land. They want it developed. They go to the realtors and say, if you help us get it developed, if you help us market it, if you help us advertise it, you can be part of dealing with the builders who come in and build who will pay you a commission on when they sell to the ultimate consumer, when they sell that house, house being built on land, obviously. When they sell that, you can get a commission. So the developers will be saying, I want the realtors to come in, front load all of their costs into this endeavor. But the realtor sells the completed product. Well, no, but it's the builder, Your Honor. They entered into deals with, contracts with builders. So they got land out there and they don't have any money and they're not sure how to get this thing started. So they go to the realtors and they ask the realtors to help, to promote this, advertise it. Is that right? That's correct, Your Honor. And then when it's all built, then the realtors get a commission when they sell the land. That's right. When the lot house transaction is closed, the builder pays the realtor the commission. They don't pay the commission. The builder pays the commission. Now, just a minute. Is there another step? In other words, I'll call it the owner developer. It might be more than one person, but the owner developer develops raw land. And what? Do they sell that land to a builder or did the builder just get an option on it? Sometimes a sale could take place, Your Honor. Sometimes the builder will option the lot, build a house on it. Option it from the owner. From the developer, the owner, not the realtor. All right. So in some cases, I'll call it the retail customer, the ultimate owner resident. Sometimes they buy it from the builder, right? The builder is the seller in that transaction. Is that right? Sometimes, Your Honor, sometimes the deed might run directly from the developer. Sometimes the deed goes from the developer, but the builder is still a part because the builder had an option on that. That's correct, Your Honor. All right. And their deals are with the builders, and the builder is the one that pays the commission. The commission is paid to the broker. Is it in both types of transactions by the builder? Yeah. The builder is the one that pays the realtors, Your Honor. The real estate broker's commission. That's correct, Your Honor. All right. So, again, it's not surprising that they haven't been able to come up with any evidence since March of 2004 to support this theory because the theory doesn't support a tying claim in the first instance. It doesn't address detrimental effects of competition on the tied product market that was always ignored by them. That's fatal to their case. They brought up a request at the summary judgment stage to say, give us more time. We need more time to do this. And our response to that is rather simple. You had enough time. What happened here was fair. You filed your first complaint in March of 2004. You had three and a half years to develop evidence as to zero foreclosure. In fact, just like in the Teamsters, the employer's Teamsters case that this court decided, they were on notice that the zero foreclosure show us the impact on competition for the tied product. They were on notice that that was coming up for decision when Cell Equity filed the first foreclosure motion in the middle of 2006. They then withdrew that so that more discovery could be had, and then all of us brought a motion in the middle of 2007. There was a year's notice to go out and get information. By April and May of 2007, by our count, looking at the briefs, 797 homeowners within the subdivisions, arguably within the class, were specifically identified. They brought forth not a single declaration from any one of those some 800 homeowners saying, I would pay for the tied product for whatever reason we don't know, but no declaration. No declaration from a builder saying, I would have hired a real estate agent to just sell the house even though it makes no economic sense. No declarations from any developer. No discovery taken. In two of the cases, not a single deposition was taken. In the other two cases, records custodian-type depositions were taken. No other subpoenas went out. No depositions were taken. And so in sum, we look back and we say, did Judge Windmill properly exercise his discretion when he did decide the 56F motion before he granted summary judgment? It was all heard at one hearing. We believe that under any standard of fairness, he certainly did not abuse his discretion. In fact, he correctly denied them additional discovery because there was nothing and counsel admitted it in response to a question from Judge Windmill. Do you have any evidence of anyone being affected in the tied product market? And counsel's answer was, no. If we were at trial and we rested, we admit we would lose. Well, that's the burden that had been shifted to them. They needed to put on something and they didn't. So unless there are other questions about the foreclosure issues or the 56F, Mr. Hartley will address the fact that they didn't buy anything and the Illinois break argument. Thank you, Your Honors. Good morning. James Hartley representing Aspen Realty. There was some talk about what this case is not at the beginning. This is not a monopolization case where one might seek reduced or inflated price. It's not a case involving an alleged conspiracy among all of the brokers in Boise. It's not a case where there is some claim that there was only one way of buying a finished new home in Boise. There certainly is no evidence of that. What it is is a tying claim. And that's all it is. And what I'm going to address in just a few minutes that we have left is simply two arguments that are related, but they are distinct and importantly so. The first is that the plaintiffs cannot prove one of the key elements of a tying claim, and that is that they actually, in fact, purchased the tied product. The second argument is that under any theory that they advanced to overcome that is that the plaintiffs cannot prove one of the key elements of a tying claim,   of a tying claim, and that is that they actually, in fact, purchased the tied product in the Delaware Services case and the Supreme Court decision in Illinois Brick. So let me first turn to the first argument.   and that is that they actually, in fact, purchased the tied product. In other cases we cite in our brief, the plaintiffs have met their burden of showing some evidence that they, in fact, purchased the tied product. I don't want to re-travel ground that was covered, but let me just simply say that each of the plaintiffs purchased a finished home from the builder. They didn't buy lots. They bought a finished home. That home, of course, was comprised of many components, studs, lighting fixtures, paint, the overhead and administrative costs of the builder. That price of that home has lots of ingredients, lots of components. But the case is they did not purchase real estate services any more than they purchased the studs or the lighting fixtures or anything else. So in each case, the builder had a listing or an understanding with the realtor which obligated the builder to pay a commission to the realtor when this home was sold. The builder in each case was paid the commission at closing. The plaintiffs in each case had no obligation whatsoever to pay a commission to the realtors, and it was the builders, not the plaintiffs, who were the direct purchasers of services from the defendants. Just ask yourself this question, and perhaps ask Mr. Spiegel, if one of the builders had not paid the commission, could the realtors have sued the plaintiffs to pay the commission? Of course not. We all know how home transactions work. None of these facts was disputed below. None of them have been disputed in the briefs, and none of them have been disputed, frankly, thus far in oral argument. So that makes it clear, I believe, that the plaintiffs themselves did not purchase the tied product. They can't state a tying claim for that very simple reason. What do they claim? I'll turn to my second point, my second argument. They claim that in one fashion or another that is ill-defined in their briefs, they are effectively, should be considered, the equivalent economically of a direct purchaser. Well, let's talk about that a little bit. First of all, the question I guess we have to talk to in terms of threshold issues is whether the Illinois BRIC doctrine, in fact, applies to tying claims. I'm not aware of any case in this circuit or the Supreme Court that directly so holds, but in the Blau brief that's in 08-35536 at page 46, there are cites to the sports racing decision in the Tenth Circuit and Link v. Mercedes-Benz, I think that's the third circuit, where the circuit courts directly hold that Illinois BRIC applies to a tying claim. And why is that right? That's right because if you look at the policies underlying Illinois BRIC, and I'm not going to go into them in much detail because this is an alternate argument. I should have said this is an ultimate argument that was not reached by the court below. Probably if one were to agree that there is zero foreclosure, there's no reason to wrestle with Illinois BRIC. I believe that's absolutely right. It's certainly appropriate to affirm on this basis. Probably. You know, I mean, Judge Winlow, I'm just guessing, but I assume one reason he avoided the Illinois BRIC realm was because this case seems to come as about as close as you can get to a cost-plus contract, doesn't it? Actually, I don't believe it does, Your Honor, because each of the plaintiffs paid a firm price, which we certainly believe it is to be assumed was set by market conditions. Plus 6 percent. Excuse me? Plus 6 percent. No, sir, that is not. That is not the case. Nowhere in the closing documents do you find a record that says the price of this building is $1,000 plus 6 percent. What you find is the plaintiff's paid $150,000, and that covered all of the expenses of the builder. It covered advertising or whatever they might have done. It covered overhead. It covered profit. It covered studs, fixtures, and everything else. But it's all passed through, isn't it? All meaning all of the commission. Well, I'm sure that the builder would like to believe that all of his costs are recovered by the price of the house. But there is no documentation here in any transaction that that, in fact, happened. It's a pretty poor builder that sets a price at a point that does not allow him to recover his costs, but nowhere is there any documentation of a specific cost pass-through. Absolutely none. And, in fact, I think I'm not going to dwell on the Illinois brick issues responding to your thought, Judge Reimer. But I do want to point out simply that this Court's decision in Delaware Valley Surgical Supply responds directly to virtually every single argument raised by plaintiffs in their opposition on the Illinois brick issues. And the Kansas v. I've got them well in mind, Your Honor. I simply want to close by saying this Court in Delaware Services, the Supreme Court in Kansas v. Utila Court set up a bright-line test with no room for further exceptions. None of the existing exceptions applies. This isn't a case, and this notion was specifically rejected, that you look at the economic substance of what happened. That concept was specifically rejected in the Delaware Services case, as were all of the other arguments raised by the appellants in connection with the Illinois brick. Mr. Boardman has a couple of short comments. Good morning, Your Honors. Richard Boardman in the 3588 case. I represent John L. Scott Park Point. My comments will be very brief. And these are not they are somewhat of an alternative argument that we've presented to you, but I really think they do cut to the chase of the foreclosure of competition. The reason I think that just, Pragerson, that you are struggling with trying to figure out what was going on here, and I suspect maybe the rest of the panel is too, is because fundamentally there are not two products or services involved in this transaction. And therefore, we can't even get to the point of discussing whether there is a tied product or services market. There is one product service involved here. The plaintiff's counsel can stand here and tell you that his clients just wanted to buy a lot. There is no evidence of that in the record, Your Honors. They set out, they confirmed in their deposition they wanted to buy a lot and a house. That's what my client's commission was based upon when he marketed the house for his client, the builder, the seller of the property. It is that simple. They're trying to put, and counsel is tired of hearing me say this, I've said it in the district court, they are trying to fit a square peg in a round hole and try to make this into an antitrust case. It does not fit for all the reasons we've cited. Thank you, judges. Thank you. I realize, as you pointed out, Judge Reimer, that the court's concern is in a specific area about foreclosure. I would like to briefly address a couple of those points. We are not trying to put a square peg in a round hole or vice versa. Our plaintiffs went to buy a lot. They wanted to buy a lot. They wanted to deal with the developer. They wanted to deal with the defendant and buy the lot and build a house. They weren't allowed to. They were forced to do it all in one transaction and pay an inflated price based on the price of the lot and the house. The ñ there was ñ along those same lines, there was the idea that, wait, there was one finished product. There was a house.  It was one finished product. No, it wasn't. When they signed their agreements, there was a lot. There was no house. They wanted to buy that lot. They wanted to buy it from the defendants. And then they wanted to be able to deal with the builder without the interference of the defendants telling them that they had to do it all in one contract, even though there was no house, and they had to pay commissions based on that entirety. So they made it an entirety, but that's the problem we see, that we should have been able to have separate dealings, first with the lot, then with building the house. And then to get back to the Rule 56F issue, we simply disagreed that we were given the time. Yes, there was time, but we kept dealing with the defendants saying, give us those documents, give us the records, let us see them. We never got them. We never had the opportunity to talk to the people who could have told us whether they wanted what they wanted to do. Did they want to buy a house and then say, look, I don't know about building a house. I'm happy to have agents involved. We never got a chance to talk to them. Those are the discrete points I want to make. If the Court has any questions, obviously, I'd be happy to answer them. Otherwise, I thank you for your time. Thank you very much. This matter will stand submitted, and the Court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Rymer, Tashima